IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
May 2, 2006 Session

## HECK VAN TRAN v.  STATE OF TENNESSEE

**Direct Appeal from the Criminal Court for Shelby County**
**No.  P-14409    John P. Colton, Jr., Judge**

---

**No. W2005-01334-CCA-R3-PD  - Filed November 9, 2006**

---

This matter is before this court following the Petitioner Heck Van Tran's motion to reopen his post-conviction petition for the limited purpose of determining whether the Petitioner is mentally retarded and thus ineligible for the death penalty.  The lower court entered an order denying relief.  The Petitioner appeals asserting that the proof established by a preponderance of the evidence that the Petitioner is mentally retarded renders his sentence of death unconstitutional.  After a review of the record and the applicable law, we affirm the lower court's denial of relief.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

JOHN EVERETT WILLIAMS, J., delivered the opinion of the court, in which THOMAS T. WOODALL and J.C. MCLIN, JJ., joined.

Brock Mehler, Nashville, Tennessee, and William D. Massey, Memphis, Tennessee, for the appellant, Heck Van Tran.

Paul G. Summers, Attorney General and Reporter; Michelle Chapman McIntire, Assistant Attorney General; William Gibbons, District Attorney General, and John Campbell, Assistant District Attorney General, for the appellee, State of Tennessee.

### OPINION

### Background

In 1989, the Petitioner was convicted of three counts of felony murder and sentenced to death for his role in the killing of three people during a robbery at a Memphis restaurant.  State v. Van Tran, 864 S.W.2d 465, 468 (Tenn. 1993).  On appeal, the Tennessee Supreme Court affirmed all three of the murder convictions and one of the death sentences.  Id.  Finding that the evidence was insufficient to establish one of the aggravating circumstances relied upon by the State, the court remanded the two remaining death sentences for resentencing.  Id.   On remand, the Petitioner received two concurrent life sentences for these two convictions.  Id.

On March 7, 1995, the Petitioner filed a petition for post-conviction relief, alleging in part that in light of his present mental incompetency it would be unconstitutional to carry out the death sentence. See Van Tran v. State, 6 S.W.3d 257, 261 (Tenn. 1999). The petition alleged that the Petitioner had been psychotic and treated with "antipsychotic, antidepressant and antiparkinson [sic] medication." Id. The petition further alleged that "numerous mental health professionals had diagnosed [the Petitioner] as suffering from chronic paranoid schizophrenia, a condition from which remission is rare and which had a prognosis of unchanged or progressive deterioration." Id. Attached to the petition was an affidavit of the attending physician at Riverbend Maximum Security Institution in which the physician opined that the Petitioner was not competent to be executed. Id. Additionally, Dr. Andrew J. Adler evaluated the Petitioner and testified at a hearing that the Petitioner had a full scale I.Q. of 67 and that he had deficits in adaptive behavior that had manifested during the developmental period before the age of eighteen. Van Tran v. State, 66 S.W.3d 790, 793 (Tenn. 2001). Dr. Lynn Zager, a psychologist called as a witness by the State, testified that the Petitioner's I.Q. was actually 72 with a standard error measurement of plus or minus three, rather than 67 as testified by Dr. Adler. Id. at 793. Dr. Zager explained that Dr. Adler had made a clerical error in applying the conversion chart. Id. The trial court accredited Dr. Zager's testimony. Id. Relief was denied by the trial court, this court, and the Tennessee Supreme Court. Van Tran, 6 S.W.3d at 261.

In December 1999, Dr. Andrew Adler again tested the Petitioner determining that the Petitioner had a full-scale I.Q. of 65. Van Tran, 66 S.W.3d at 794. Relying upon this data, the Petitioner filed a motion to reopen his post-conviction petition on February 7, 2000. Id. The trial court issued a preliminary order denying the motion to reopen, and this Court denied the Petitioner's application for permission to appeal. Id. The Tennessee Supreme Court, however, granted application for permission to appeal. Our supreme court, in a matter of first impression, held that "the Eighth Amendment to the United States Constitution and article I, § 16 of the Tennessee Constitution prohibit the execution of mentally retarded individuals because such executions violate evolving standards of decency that mark the progress of a maturing society, are grossly disproportionate, and serve no valid penological purpose. . . ." Van Tran, 66 S.W.3d at 792. In accordance with this holding, the supreme court remanded this matter to the trial court for further proceedings.

**Post-Conviction Proceeding**

Dr. Daniel H. Grant, a psychologist licensed in the State of Georgia, testified that he specializes in the areas of pain management, that he is board certified as a neuropsychologist and forensic examiner, and that he is a board certified expert in traumatic stress. Dr. Grant's credentials established him as an expert in mental retardation and neuro-psychology. Dr. Grant evaluated the Petitioner on November 13 and 16, 2002. He explained that his examination consisted of the administration of numerous tests over a two-day period. In addition to these tests, Dr. Grant reviewed documents and affidavits, interviewed the Petitioner, and talked with some of the officers at the "Correctional Center."

Dr. Grant related that the statutory definition of mental retardation provides that mental retardation is "the significant sub-average intellectual functioning as evidenced by an I.Q. of 70, or below, deficits in adaptive behavior, and it has to be manifested during the developmental period or by the age of eighteen." He commented that psychologists rely upon a similar standard. Dr. Grant cited to the standard set forth in the Diagnostic and Statistical Manual of Mental Disorders, the DSM-IV, and the revised edition called TR, which provides that, for an individual to be classified mentally retarded, the individual "would have to have an intellectual functioning with an I.Q. between 70, it could go up to 85, because they take into consideration the standard error of measurement of the instrument. . . . That he has to have significant subaverage adaptive behavior. And again, these criteria have to have been met by the age of eighteen, or the end of the developmental period." "Adaptive behavior" is defined by the DSM-IV by ten criteria contained in social skills, communication, work, leisure, home living, functional academics and use within the community. Dr. Grant explained that all ten criteria need not be met. Rather, a deficit in any two of the areas will satisfy the criteria for "significant deficits in adaptive behavior." Dr. Grant also related the standard on mental retardation established by the American Association on Mental Retardation. This standard defines mental retardation as "a disability characterized by significant limitations of both intellectual functioning and adaptive behavior and expressed in conceptual, social and practical adaptive skills." To meet this criteria, "the level of intelligence and the level of deficit adaptive behavior have to be two standard deviations below the norm, which is 100." Again, these deficits must occur during the developmental period and before the age of eighteen.

As a result of his evaluation of the Petitioner, Dr. Grant summarized that, in his clinical opinion, the Petitioner satisfied the criteria set forth in Tennessee Code Annotated section 39-13-203, "as having significant sub-average intellectual functioning, evidenced by the I.Q. of 70, or below." He added that the Petitioner had "deficits in adaptive behavior as defined by the American Association of Mental Retardation and the American Psychiatric Association. And both of those deficits manifested before the age of eighteen." Specifically, Dr. Grant concluded that the Petitioner has an intelligence quotient of 70 or below. This assessment was made pursuant to the administration of the Weschler Adult Intelligence Scale, III Edition, after which the Petitioner was assessed as having a full scale I.Q. of 70. Dr. Grant mentioned that the Petitioner had a performance I.Q. of 76 and a verbal I.Q. of 70. He noted, however, that the "full scale is considered to be the most valid and most reliable of the three measures and the full scale should be considered as the score to be used." Dr. Grant added that his results were consistent with the results reached after administration of the same test by Dr. Adler. After Dr. Adler's administration of the Wechsler test, the Petitioner had received a verbal I.Q. of 67, a performance I.Q. of 68 and a full scale I.Q. of 65. Dr. Adler's administration of the test occurred prior to Dr. Grant's administration of the test. Dr. Grant concluded that this fact explained the higher score achieved by the Petitioner during his administration of the test. He noted that the Wechsler's Adult Intelligence Scale – Revised, was administered to the Petitioner in 1996. The results of this testing revealed a verbal I.Q. of 71, a performance I.Q. of 77 and a full scale I.Q. of 72. He noted that the full scale score of 72 was most likely inflated a full three points because of the age of the test.

In addition to the Wechsler test, Dr. Grant administered the Comprehensive Test of

Nonverbal Intelligence, a test of intelligence not requiring language on the part of either the administer or the participant. Dr. Grant explained that this test is comprised of two sub-tests, one part pictorial non-verbal and one part geometric non-verbal. On the pictorial test, the Petitioner received an I.Q. score of 68. He received an I.Q. score of 72 on the geometric non-verbal test. These two scores resulted in an overall I.Q. score of 68. Dr. Grant acknowledged that the Petitioner's consistent scores between 65 and 70 on all four occasions when testing was administered was significant in the fact that it "shows a strong validity, strong reliability, across the different instruments, as well as administration of the same instruments at different periods of time."

Other testimony was administered in order to evaluate the Petitioner's language and communication skills, including the Peabody picture vocabulary test. The Petitioner scored a 53 on this test, reflecting that the Petitioner has a "weakness, or a deficit in receptive, or hearing vocabulary." Dr. Grant described this deficit as "severe." Also administered was the expressive vocabulary test, on which the Petitioner scored "a status score of less than 40." Dr. Grant related that this "was the lowest score that the norms would go to and he was 40 or less than 40." Another test on oral written language skills, nicknamed the OWLS, was administered to determine the ability to comprehend the spoken word and to assess ability to comprehend the language. The Petitioner had a standard score of 68 on the sub-test, which, although being consistent with his level of intelligence, revealed a significant deficit. The oral expressive sub-test was also administered. The Petitioner scored a 62 on this sub-test. The composite score on these two sub-tests was a 63, "which means, his overall language ability for listening comprehension and oral expression over those two measures are the 63." This score indicates a significant deficit.

Dr. Grant admitted that the Petitioner's native language is Vietnamese and that the tests were administered in English. He explained that this was one reason why he administered the Comprehensive Test of Nonverbal Intelligence, because it does not require a language on the part of the administer or the participant. Dr. Grant stated that the Petitioner's result on this test was consistent with the Petitioner's performance on the Wechsler test. Additionally, he stated that Dr. Wasserman interviewed the Petitioner and administered a measure of his use of his Vietnamese language and also of his ability to read in Vietnamese. This examination resulted in findings that the Petitioner is impaired in both English and Vietnamese, with the Petitioner being more impaired in Vietnamese than in English. The Petitioner's comprehension in Vietnamese was poor. Dr. Wasserman concluded that the Petitioner's English proficiency exceed the Vietnamese language proficiency and that she would therefore expect that he would score higher on tests that were administered in English than on tests that were administered in Vietnamese. Dr. Grant stated that the Petitioner's deficits in the Vietnamese language were that of a five-year-old and were two standard deviations below of what you would expect. Dr. Grant added that these deficits were consistent with the results from Dr. Adler's administration of the CELF, clinical evaluation of language fundamentals. On this test, the Petitioner had received a receptive language score of 50, an expressive language score of 50 and a total score of less than 50. Dr. Grant stated that the Petitioner's deficits in communication skills satisfied one of the two criteria needed by the classification system for retardation.

Regarding an assessment of the Petitioner's academic skills, Dr. Grant administered the Kaufman functional academic skills test. On this test, the Petitioner received an arithmetic standard score of 93, a reading standard score of 66, and a functional academic score of 79. The Petitioner had a reading comprehension score of 4.1 and, on the wide range achievement test, he received a reading grade level of 3.1 with a standard score of 57. Dr. Grant continued that the Petitioner's spelling was at a 4.1 grade level and his math skills were at a 7.6 grade level. Dr. Grant placed little import as to the Petitioner's performance on the arithmetic testing, noting that all individuals, even mentally retarded individuals, have strengths and weaknesses and that mathematics was one of the Petitioner's areas of strength. Dr. Grant stated that the Petitioner's poor performance in spelling, reading, and reading comprehension were evidence of a significant deficit. In this regard, Dr. Grant noted that the Petitioner has been in a G.E.D. (general equivalency diploma) program classroom for eight to nine years and he is still scoring at a 4.1 grade level in reading. Dr. Grant stated that the Petitioner's "functional academic skills are significantly impaired," thus satisfying another of the criteria needed by the classification system for retardation.

Dr. Grant also administered the Independent Living Scales test designed to measure an individual's ability to live or function independently. On this test, the Petitioner received a score of 69. This score meets the criteria for having a significant deficit in adaptive behavior because it fell two standard deviations below the mean. The Petitioner was also subject to the Vineland adaptive behavior scale. This test was administered twice by Dr. Adler, revealing scores of 58 and 65. Dr. Grant stated that both of these measures meet criteria for the American Association of Mental Retardation as two standard deviations below the mean for adaptive behavior.

Dr. Grant concluded that based upon the tests administered to the Petitioner regarding his abilities, communication, language skills, and independent living that the Petitioner had significant deficits in adaptive behavior. He further concluded that these deficits manifested during the Petitioner's developmental period. To support this second conclusion, Dr. Grant based his decision upon a social history compiled by Mr. Dinh. This report revealed that the Petitioner did not speak until he was six years old, did not do well in school, failed to learn as other individuals in his English as a Second Language class in the Memphis school system, and had difficulty living independently. Dr. Grant added that his evaluation revealed that the Petitioner had never succeeded in living independently.

Dr. Grant testified that the Petitioner's social history also contained some identifiable "risk factors" for mental retardation. These factors included the fact that the Petitioner did not speak until he was six years old. Another factor is that he was not toilet-trained until he was five years old. Dr. Grant again stated that it was his opinion that the Petitioner is mentally retarded pursuant to the terms of the statute, the terms of the DSM-IV, and the standards of the American Association of Mental Retardation.

On cross-examination, Dr. Grant testified that the Petitioner came to the United States from Vietnam when he was sixteen or seventeen years old. Only after arriving in the United States did the Petitioner learn to speak and write English. Notwithstanding, Dr. Grant maintained that the

Petitioner was more proficient in the English language than in his native Vietnamese. He added that the Petitioner only attended school for two years while in Vietnam.

Dr. Grant agreed with the prosecutor that the Petitioner's living conditions in Vietnam were "down right horrible." The Petitioner and his mother lived "on the street," "basically, through black market, selling cigarettes and things." The Petitioner came to this country through a sponsorship by Catholic Charities. It was only a "few years" from the time of his arrival in this country, when he was seventeen, until he was incarcerated at age twenty. Dr. Grant failed to concede that the Petitioner's life history would have had a substantial impact on his failure to properly respond to lifestyle questions asked in correspondence to his evaluation.

Dr. Grant conceded that the W.A.I.S. – III test for I.Q. was potentially not an accurate test for persons of Asian ancestry. To compensate for any inaccuracies, Dr. Grant stated that he "gave the second measure to control for that. . . ." He added that there was no basis on which to believe that the Petitioner's I.Q. had "gone down over the years." Dr. Grant acknowledged that the Petitioner had been diagnosed a schizophrenic and that the cognitive ability of a person with schizophrenia will decrease over time. Dr. Grant maintained, however, that the Petitioner was "functioning essentially the same place he was functioning when he was administered those achievement tests at Sheffield High School." He added that it was not significant, in his opinion, that the Petitioner's performance I.Q. was six points higher than his overall I.Q. Dr. Grant noted that the Petitioner had significant neurological impairments. He stated that these existed prior to the on-set of his schizophrenia. These neurological impairments impaired the Petitioner's ability to acquire knowledge and language and also impaired his ability to adapt. Dr. Grant maintained that the Petitioner was at a sufficiently retarded level prior to the onset of his schizophrenia. It was also revealed that the Petitioner's mother has a low cognitive ability. This fact would not have impaired her ability to understand the questions contained in the Vineland assessment.

Dr. Grant further explained that it was possible for a mentally retarded individual to learn another language as accomplished by the Petitioner. He further stated that mentally retarded individuals could work, go to school, and achieve learning levels up to the sixth grade.

Dr. Pamela Auble, a psychologist with a specialty in neuropsychology, examined the Petitioner in November 2002. Her evaluation was comprised of some standardized testing administered to the Petitioner and of interviews with the Petitioner, as well as other persons whom had been involved with the Petitioner. The people other than the Petitioner included a correctional officer, three doctors, an attorney, and the Petitioner's mother. As a result of her evaluation, Dr. Auble found that the Petitioner "met the criteria for mental retardation. [She] also found evidence of neurological impairment as defined as deficits in other areas of functioning."

Dr. Auble related that the nationally accepted definition of mental retardation was contained in the DSM-IV. She explained that the DSM-IV's definition consisted of three prongs: "[o]ne, is significantly sub-average intellectual functioning as evidenced by an IQ of . . . approximately 70 or below. Second, deficits and adaptive behavior, which has a very specific meaning and looks at very

specific areas. And, third, that it must be manifested by age 18." Dr. Auble opined that this standard and the Tennessee standard are basically the same. She noted that the Tennessee statute states significantly sub-average intellectual functioning as evidenced by a functional I.Q. of 70 or below where the DSM-IV provides for an I.Q. of "approximately 70" and the AAMR definition provides "70 to 75." Notwithstanding these differences, Dr. Auble maintained that all three definitions are "all talking about an IQ, a true IQ that's two standard deviations below the means."

Dr. Auble stated that eighty-five percent of the persons who are mentally retarded fall in the range of mild mental retardation, an I.Q. in the range of fifty (50) to seventy (70). These persons attain some level of life and work skills, can hold a job, and may be able to obtain academic skills about to the sixth grade level. People in the lower levels, I.Q.s between forty-nine (49) and twenty (20), and classified as moderate, severe, or profound mental retardation, "mainly live in institutions or under very supervised settings." Dr. Auble commented that even those persons with mild mental retardation require some degree of "support services."

Dr. Auble proceeded to provide a definition of "adaptive behavior," the second prong for the diagnosis of mental retardation. She explained that the DSM-IV listed ten or eleven areas of functioning. These areas include communication, self-direction, functional academics, home living, social/interpersonal, self-care, use of community resources, work, leisure, health, and safety. To have a deficit in adaptive behavior, one must have deficits in at least two of the eleven areas of functioning. As Dr. Auble explained:

> The AAMR, Tenth Edition, defines adaptive functioning as deficits falling into at least one of three areas. One is practical, which is the ability to maintain yourself independently in terms of academics and work environment. The second is social, which involves gullibility, social understanding, the ability to avoid being a victim, taking responsibility, home skills. And the third is conceptual. An area which involves language, reading, writing, managing money, self-direction, and abilities in that order.

Dr. Auble stated that, under the AAMR definition, one needed one of these three areas to qualify for a diagnosis of mental retardation in the adaptive deficits prong. She explained that one need not have deficits in all of the areas. In this regard, Dr. Auble noted that, "like the rest of us," "people with mental retardation" "have strengths and weaknesses and may have deficits in some areas and relatively good functioning in other areas."

Dr. Auble further testified that she conducted neuropsychological testing and testing for different areas of functioning such as memory and mental flexibility, language, and also malingering. She "found that [the Petitioner] passed the malingering test." She stated that he did not appear to be faking and was "putting forth a good effort on the test procedures." The neuropsychological testing indicated impairments. Dr. Auble related that she administered the Halstead Reitan Battery, the most widely accepted neuropsychological test battery in the United States, which is a series of tests from which you obtain a global measure of how impaired he is over those multiple tests. The Petitioner's Halstead Impairment Index was .9. Dr. Auble explained that the scale ranges from zero to one, with the higher scores indicating more impairment. Accordingly, the Petitioner's score of

".9 is close to as bad as it gets and is in the impaired range."

Identifying the particular impairments, Dr. Auble testified that the Petitioner had specific impairments in four areas. First, the Petitioner had deficits in tasks that measure frontal lobe functioning. Dr. Auble explained that frontal lobe functioning has to do with the "ability of a person to adapt to a new situation, to modify their behavior when things change, to switch from one idea to the next. It's a kind of mental flexibility." As a result of the Petitioner's performance on a variety of frontal lobe tests, Dr. Auble described him as "mentally rigid," "[o]nce he gets into an idea he has trouble changing that idea." To exemplify her statement, Dr. Auble stated that the Petitioner had trouble with tests that "involved him figuring out the meaning of a new word by giving him examples of that word in a different context."

Second, Dr. Auble concluded that the Petitioner had "evidence of deficits on testing of language and verbal communication." These results were consistent with results reached on other evaluations of the Petitioner. She explained that the Petitioner had difficulty naming common objects on the Boston Naming Test. Likewise, on the Boston Diagnostic Aphasia Exam, "he had trouble understanding" "pretty short" stories. Dr. Auble related that the Petitioner's performance on this test was "about average for someone who has an aphasia or a language disturbance." Another indication that the Petitioner had a language disturbance was the fact that the Petitioner had difficulty repeating what Dr. Auble had said.

The Petitioner's third area of impairment was on memory testing. Dr. Auble stated that the Petitioner's "memory is particularly poor for information that he's told, for stories, for words." She further explained that the Wechsler Memory Scale is normed with the Wechsler Intelligence Scale, meaning that the person's memory skill corresponds with their intelligence level. She added that the Petitioner's memory "was significantly below what you would expect for someone who has an IQ of 65." Thus, the Petitioner has a deficit in his verbal memory that is lower than one would expect for someone of his level of intelligence.

The final area of impairment was on motor speed, which is a finger tapping test. Dr. Auble reported that the Petitioner was slow with both hands, both his right hand and with his left hand.

Dr. Auble remarked that identification of these areas of impairment is important in evaluating mental retardation because it reveals things that I.Q. does not measure. These impairments further indicate that the Petitioner has extensive deficits that are above and beyond what you would expect in somebody even with his I.Q. level. Dr. Auble continued that these impairments have an impact on the Petitioner's adaptive functioning and on his functional intelligence. In terms of mental retardation, Dr. Auble stated that there was evidence of neurological impairments prior to his attaining the age of eighteen.

In making her evaluations, Dr. Auble reviewed the three Wechsler Intelligence Tests, one administered by Dr. Adler in 1996, the second administered by Dr. Adler in 1999, and the third administered by Dr. Grant in 2002. She related that the Petitioner received a full scale I.Q. of 72 on

the 1996 test. This score was received at the conclusion of a norming period of the test and immediately prior to the Wechsler III test coming out. Dr. Auble related that this score was actually 2.9 points higher than it would have been had the Petitioner been administered the Wechsler III test. Accordingly, she related that the score of 72 was, in actuality, a score of 69 on the Wechsler III test. As to the remaining tests, the Petitioner received a full scale I.Q. of 65 on the 1999 test and a full scale I.Q. of 70 on the 2002 test. Dr. Auble also considered the Comprehensive Test of Non-verbal Intelligence conducted by Dr. Grant. The Petitioner received a non-verbal I.Q. score of 68 on this test. Dr. Auble concluded that all of these scores were consistent with one another.

Dr. Auble further added that the scores were not lowered in any way due to the fact that the tests were not normed on an Asian population. She explained that, although there are no Asian language versions of the Wechsler Intelligence Scale, there has been a study of the Wechsler Intelligence Scale for Children revised with Asian Americans which finds that the Wechsler Intelligence Scale for Children is valid in predicting academic achievement in Asian children. Moreover, in determining the validity of I.Q. testing, one can consider an individual's performance on a particular sub-part of the test which is "heavily loaded . . . in American culture." She noted that, while the Petitioner scored a 6 on this sub-part, which is below average, this score was higher than 11 of the 12 other sub-parts of the test, indicating that the Petitioner is not performing "less well on questions that have a heavy cultural loading." Another measure is the Comprehensive Test of Non-verbal Intelligence. She explained that this test was designed to be given to individuals who have different cultures and different history. Specifically, she noted that the Comprehensive Test of Non-verbal Intelligence "has normative data for Asians." "The non-verbal IQ for the Asians was an 103. [The Petitioner's] score [was] 68." Finally, Dr. Auble noted that "in general, Asian Americans tend to score higher than Caucasians on tests of cognitive ability." In so stating, she referred to a study indicating that "Asian's in general have larger brains than Caucasians." In essence, the study relied upon by Dr. Auble indicated that any bias in the testing scores would favor Asians over Caucasians. Dr. Auble further testified that the Petitioner's primary language is English, not Vietnamese. She further explained that Dr. Wasserman, a doctor who previously evaluated the Petitioner, was fluent in both Vietnamese and English. Dr. Wasserman evaluated the Petitioner and determined that while the Petitioner's English was below expectations, his English was still better than his proficiency in Vietnamese. Indeed, Dr. Wasserman noted that the Petitioner "did not even know the complete Vietnamese alphabet."

When questioned as to the impact that the Petitioner's schizophrenia had upon his I.Q., Dr. Auble stated that, in her opinion, this fact did not lower the Petitioner's I.Q. This conclusion was based upon three facts. One, the Petitioner's symptoms of schizophrenia were relatively well-controlled. This fact means that he was able to focus attention on the test and, therefore, his schizophrenia did not effect his performance on the intelligence test. She recalled that the Petitioner put forth a "good effort and that he was attending to the task before him." Additionally, she added that there was longitudinal research indicating that deficits are present many years before schizophrenia ever develops. In stating this fact, Dr. Auble relied upon a study published in 1999 which indicated that I.Q. is generally lower in children who develop schizophrenia years later. In other words, she summarized that the I.Q. does not decline; rather, it starts out low and ends low.

Finally, Dr. Auble stated that, where treatment is initiated promptly upon diagnoses, then I.Q. scores do not decline and can, in fact, improve. From what Dr. Auble was able to ascertain from prison records, the Petitioner has been treated since his schizophrenia was diagnosed. The Petitioner was taking the prescription medication Haldol for his schizophrenia. Dr. Auble stated that without the Haldol the Petitioner, most likely, would not have been testable.

Regarding the second prong for finding mental retardation adaptive deficits, Dr. Auble explained that, in order to determine whether a person had adaptive deficits, a psychologist would use standardized scales obtained by having the person perform various tasks or through the report of other people. A psychologist would also use social history information. Finally, there are some specific tests designed to assess adaptive behavior. Dr. Auble stated that Dr. Grant and Dr. Adler administered the standardized tests to the Petitioner in this case. Dr. Auble related that the Petitioner's score on the Independent Living Scale, one of these specialized tests, was 69. She also reported that two Vineland tests were administered; one was filled out by the Petitioner's mother, and the other was completed by correctional officers at Riverbend. The overall score on the Vineland tests was 65. These scores placed the Petitioner in the impaired range, which is two standard deviations below the mean. Dr. Auble stated that, according to the AAMR and the DSM-IV, these tests scores were illustrative of adaptive deficits. Dr. Auble further stated that, in her opinion, the Petitioner "met five of the 10 or 11 areas of adaptive deficits from the DSM-IV list of criteria." Specifically, the Petitioner exhibited clear deficits in his basic language skills and communication. He exhibited clear deficits in functional academics. In this regard, Dr. Auble stated that the Petitioner has been in a GED program since 1990, has yet to complete the class, and has not progressed. Dr. Auble also concluded that the Petitioner's conceptional reasoning and adaptive flexibility were impaired. A guard at the correctional facility described the Petitioner as "child like." Dr. Auble added that the Petitioner does well in the prison setting, which is highly structured and which does not require him to make decisions. Fourth, Dr. Auble stated that the Petitioner is impaired on the independent living scale sub-test measuring health and safety. On this test, the Petitioner's score was only 55. Fifth, in terms of social and interpersonal functioning, the Petitioner was characterized as gullible and as a follower.

Dr. Auble testified as to how the Petitioner's adaptive behavior fit within the three domains of the AAMR Tenth Edition. The first domain is conceptual encompassing things like language, reading skills, and writing skills. Dr. Auble related that the Petitioner shows impairment as to all of these skills. The Petitioner does not adapt to change, and he does not do well in complex situations that require him to alter his behavior. The Petitioner has trouble remembering. She added that he "tends to do what he is told." Dr. Auble stated that the Petitioner has never lived completely on his own.

When questioned as to the effect of the Petitioner's "street smarts," Dr. Auble stated that "street smarts" is slang and is not a scientific term with scientific standards. However, using a "slang dictionary," Dr. Auble defined "street smarts" as "cunning and clever particularly at surviving in urban settings." Under this definition, Dr. Auble opined that there had not been any evidence of the Petitioner being cunning or clever in his life history. She explained that, from the Petitioner's early

to late childhood, he lived on the streets with his mother. She stated that he "barely survived." Once in the United States and in school, the Petitioner learned English more slowly than others who had started with him. He left school after one year. The Petitioner began using alcohol and drugs on a daily basis. The Petitioner has never been able to maintain a stable living situation or to live completely independently. The Petitioner had conflicts with his mother. He lived with Carolyn Mitchell who encouraged him to leave because he was too dependent on her. He lived with several young men and with a girlfriend.

As to the third requirement under the AAMR, Dr. Auble stated that the evidence indicates that the impairments appeared during the Petitioner's developmental period. In this regard, she stated that the Petitioner's life history indicates a number of risk factors that would have contributed to his mental retardation. Using a table listing various potential risk factors for mental retardation provided in the Tenth Edition of the AAMR, Dr. Auble proceeded to enumerate those factors applicable to the Petitioner. First, the Petitioner's mother had poor prenatal care. The Petitioner's mother suffered from a fall while she was pregnant resulting in "some bleeding and some other injuries. . . . The Petitioner's mother "smoked about a half a pack a day at the time she was pregnant with him." The Petitioner's mother is "probably relatively limited in intelligence." The Petitioner did not have medical treatment while he lived in Vietnam. As a child, he had malnutrition and reportedly had seizures. The Petitioner had traumatic brain injuries. The Petitioner also lacked adequate stimulation and experienced family poverty. His living situation was essentially homeless. During his childhood, he only attended school for two years. The Petitioner suffered child abuse and neglect. The Petitioner had no consistent caretakers or friends. His mother was a single parent, and the Petitioner did not really know his father. The Petitioner did not speak until he was six years old, and, when he did speak, his speech was abnormal. Presently, the Petitioner has speech impairments in both Vietnamese and English. The Petitioner was a poor student, although he did have good attendance. "These findings indicate that there was brain dysfunction that was present in childhood as well as present now." Dr. Auble summarized, ". . .he had an impaired mother. He had lack of support from his family. He had abuse, poverty, war, discrimination . . ., early drug and alcohol abuse. All of this contributed to his compromised functioning during childhood." She concluded that, in her opinion, the Petitioner is "mentally retarded under the definition of the Tennessee Statute, the AAMR and the DSM manual."

On cross-examination, Dr. Auble reaffirmed that the Petitioner first came to the United States when he was seventeen years old and could only speak Vietnamese. Once in the United States, the Petitioner was enrolled in a program that was designed to assimilate foreign born students into the system. The Petitioner remained in this program for one year. During this time, he did not take an I.Q. test. He was, however, "given achievement testing." On this testing, the Petitioner received a "grade of 'C' for social interaction. A 'B' for one period of bilingual studies, first semester. And all of those other classes were 'D.'" Although Dr. Auble stated that, in her opinion, the Petitioner was not able to live independently, she conceded that the Petitioner "took care of [Ms. Mitchell] and her children" when he lived with her. In fact, the Petitioner did "some cooking" and helped her children get ready for school. Dr. Auble further conceded that the Petitioner has had "several jobs." In fact, the Petitioner's last place of employment was with Whittington Building Supplies. His job

duties consisted of cleaning the yard and cutting wood to fixed lengths.  Two days prior to the crime for which he is currently under a sentence of death, the Petitioner was promoted from an outside job to the same job inside the shop.  The Petitioner was described as an "excellent employee" by his managers.  Dr. Auble confirmed that the Petitioner had also been employed for a while at Jade East," the location of the crime, for a while.  The Petitioner reported that he had been "fired from Jade East because he [made too many egg rolls]."

Again, Dr. Auble conceded that the Petitioner was not administered any type of evaluation until he was incarcerated and that this testing was at the request of the Petitioner's counsel.  She stated that the first I.Q. test was administered to the Petitioner by Dr. Adler in 1996.  The Petitioner received an I.Q. score of 72.  Dr. Auble explained that this score was inflated, however, due to the "Flynn Effect," or re-norming of the test.  Dr. Auble stated that the fact that a person has an I.Q. below 70 does not, by itself, render that person mentally retarded.

Dr. Auble stated that the Petitioner was first diagnosed with schizophrenia in August 1990 by Dr. Humble.  Dr. Auble explained that, shortly after the Petitioner's arrival at Riverbend, "he started exhibiting very bizarre behavior."  The Petitioner began taking medication on August 9, 1990. However, Dr. Auble conceded that the Petitioner still experienced hallucinations in 1992.  She affirmed that this may have been due to the Petitioner's refusal to take his medication.  Throughout August 1993, the Petitioner still complained of hearing "auditor hallucinations," stating that the medication improved the hallucinations but did not eliminate them.  Dr. Auble stated that the Petitioner was prescribed neuroleptic antipsychotic medication pretty consistently since 1990.  He began taking Haldol, then took Prolixin, and for a time Thorazine.  Dr. Auble stated that, although Haldol is one of the oldest neuroleptics, the Petitioner was probably still taking it because it was cheaper than the newer medications.

Based upon the proof presented at the evidentiary hearings, the Petitioner averred that he is mentally retarded within the meaning of Tennessee Code Annotated section 39-13-203, and asserted that his sentence of death should be modified to a sentence of life imprisonment.

### Proof Introduced at Prior Proceedings

A.  Trial

The material facts of the crimes committed by the Petitioner are set forth below as incorporated from our supreme court's decision on direct appeal:

> On the afternoon of October 20, 1987, Arthur Lee, Amy Lee, and Kai Yin Chuey were found dead in the Jade East Restaurant in Memphis.  The restaurant had not yet opened for business that day, and the victims had apparently been inside making preparations for the evening.  Jewelry with a wholesale value of $25,000.00 had been taken from the restaurant.  The State's critical proof included: a statement taken from the Defendant in which he admitted his

involvement in the crimes; Defendant's fingerprint on one of the jewelry cases taken during the robbery; and the eyewitness identification of the Defendant by a survivor of the robbery.

. . .

The Defendant . . . was born on November 7, 1966. His mother was Vietnamese; and his father, an American serviceman, died in Vietnam in 1968. The Defendant started school when he was six years old but stopped when Saigon fell. In 1983 a Catholic relief agency resettled the Defendant and his mother in Memphis. The Defendant briefly attended school before dropping out in 1984.

After his arrest by the Houston, Texas, police, Defendant gave a statement in which he acknowledged his role in the robbery and murders. He stated that he had worked briefly at the Jade East Restaurant a month or two before the crimes and that Mr. Lee had fired him because "he didn't like me" and "said I cooked too many egg rolls." The Defendant implicated Hung Van Chung, Kong Chung Bounnam and Duc Phuoc Doan in the robbery. He stated that the four men entered the back door of the restaurant and he talked to Arthur Lee "for about ten minutes before there was any shooting." The Defendant had a .22 revolver, Bounnam a .44, Chung a .22 and Doan a .25.

. . . [A]fter the group pulled out their guns:
Mr. Lee grabbed Nam's [Bounnam's] hand with the gun and elbowed him in the chest. Nam fell back and hit the old lady. The old lady fell on me and when she hit me it caused the gun to go off. I don't know what I hit that time. Mr. Lee then kicked Hung [Chung]/ I heard Hung Chung shoot one or two times and then Mr. Lee tried to grab the gun and Hung Chung shoot him. While Mr. Lee was trying to get Hung [Chung's] gun, I told him not to or I would have to hurt him. He turned and tried to get my gun and I shot him. He fell and was moving around and I shot him in the face somewhere. Then I walked thr[ough] the door where they kept the money and gold. I looked up and saw the old lady roll over. I thought she had something in her hand. I shot her in the back of the head.

While the Defendant was in the office collecting the jewelry, he heard more shots. He stated that he did not know "who was shooting or what" or who had shot "the young girl," Amy Lee. Upon leaving the office, the Defendant saw Bounnam holding Ging Sam Lee. The Defendant told Bounnam not to hurt her. Bounnam hit Mrs. Lee on the back of the head, and all the assailants left.

Outside the restaurant, the Defendant discovered that Bounnam had been shot in the left leg near the groin. Bounnam claimed that the Defendant had shot him. The group fled in Bounnam's Camaro to an acquaintance's apartment. From

there, the Defendant, Bounnam and Chung drove Chung's car to Washington, D.C. Bounnam's Camaro was left in Memphis. Doan remained in Tennessee.

From Washington, the trio drove to Houston, Texas. Once in Houston, the Defendant went to the Saigon Pool Hall and talked with a Vietnamese man about selling some gold. The man took the gold and returned in about ten minutes with $4,000.00. The Defendant paid the man $200 and divided the rest three ways. Later, Bounnam flew to North Carolina and Chung went to Dallas with a friend.

On April 28, 1988, almost six months after the robbery, the Defendant was arrested in Houston. . . .

## 2. Post-Conviction Proceeding

The Petitioner argued that he was mentally retarded in his original petition for post-conviction relief. At the evidentiary hearing on this petition, the Petitioner presented the testimony of Dr. Andrew Adler, a psychologist who administered psychological tests to the Petitioner. See Heck Van Tran v. State, No. 02C01-9803-CR-00078, 1999 WL 177560, *6 (Tenn. Crim. App., at Jackson, Apr. 1, 1999). Dr. Adler testified that the Petitioner's I.Q. was 67. Dr. Adler also concluded that the Petitioner suffered from paranoid schizophrenia, in addition to, post-traumatic stress disorder. However, the post-conviction court found that Dr. Adler misread the manual relating to I.Q. calculation. Id. Dr. Lynn Zager, a psychologist who testified for the State, related that the proper calculation was 72, not 67. Id.

Additionally, the proof established that the Petitioner's appointed trial counsel reported an initial difficulty in communicating with the Petitioner due to the language barrier. Id. at 8. However, once an interpreter was appointed, counsel reported that the Petitioner was able to understand. Id. Both counselors Quinn and Scarmoutsos reported that neither felt that competency was an issue. Id. Trial counsel retained the services of Dr. Khanna, a clinical psychologist, prior to trial. Id. Dr. Khanna found the Petitioner to be below the average intelligence level, depressed with suicidal ideations, and under a great deal of stress. Id. There was no indication from Dr. Khanna that the Petitioner was incompetent. Id.

Dr. William Kenner was appointed by the Davidson County Probate Court in 1992 to determine whether the Petitioner was competent to make decisions about his medical care. Id. Dr. Kenner determined that the Petitioner was not competent to make such determinations. Id. Dr. Kenner also performed an evaluation of the Petitioner in April 1997 at the request of post-conviction counsel. Id. At the time of the post-conviction hearing, Dr. Kenner believed the Petitioner to be suffering from chronic, severe paranoid schizophrenia. Id. Dr. Kenner informed the post-conviction court that the onset of this illness is preceded by a prodomal phase that slowly develops over a number of months, sometimes years. Id.

## Findings of Post-Conviction Court

On May 5, 2004, the post-conviction court denied the Petitioner's request for relief. The trial court, relying upon the instructions provided by the Tennessee Supreme Court in Van Tran and Howell concluded that the Petitioner did not "meet the definition of mental retardation as set forth by the statute." The trial court denied the motion to reopen. The court's order denying relief was comprehensive and detailed, consisting of approximately fifty (50) pages.

The trial court noted that it must determine "whether petitioner has established, *by a preponderance of the evidence*, that (1) he has significant subaverage intellectual functioning evidenced by a functional intelligence quotient of seventy or below; (2) he suffers from deficits in adaptive behavior and (3) the deficits in both I.Q. and adaptive behavior developed prior to the age of eighteen. See Van Tran, 66 S.W.3d 790, 812, applying Tenn. Code Ann. 39-13-203; Michael Wayne Howell v. State, 151 S.W.3d 450 (Tenn. 2004) (filed November16, 2004 at Jackson)." Applying these guidelines, the court proceeded to evaluate each of the "elements" of "mental retardation independently." Initially, the trial court noted the extreme difficulty in making a determination in this particular case given the fact that the Petitioner speaks very little English; has very little formal education; lived most of his "young life" on the streets of Vietnam and lived most of his adult life in prison; and the fact that the Petitioner suffers from paranoid schizophrenia. With these circumstances present, the trial court questioned that ability of standardized testing to accurately determine the Petitioner's level of intelligence. The court then made the following findings as summarized herein.

The court found that "the [P]etitioner has proven by a preponderance of the evidence that he has a functional intelligence quotient of seventy (70) or below." Although the court found that the 1996 test score of 72 did not satisfy the first criteria of the statute, the additional testing performed upon Petitioner did indicate that the Petitioner's I.Q. was below 70. Specifically, the trial court found that "[a]ll three subsequent I.Q. tests scores [65, 70, and 68] meet the requirements of [Tennessee Code Annotated section] 39-13-203(a)(1)."

Next, the trial court determined that the Petitioner "does not have deficits in adaptive behavior." In making this finding, the trial court noted:

> This court notes its agreement with the State's assessment that, due to the unique circumstances of the petitioner's background, some of the questions posed on the Independent Living Scale border on the absurd. Additionally, this court notes the testimony of Dr. Grant on re-direct examination, in which he testified that, the three years the petitioner spent in this country as a free person would be sufficient for him to learn some of the skills that are measured by the Independent Living Scale, but certainly not all of them. Moreover, the fact that the petitioner had been incarcerated for more than ten years when these tests were administered certainly effect their efficacy. Thus, despite the assertions of Dr. Auble and Dr. Grant's [sic], this court is convinced by the State's cross examination of the expert witnesses and arguments of counsel, that the Independent Living Scale

should be given limited weight in this case. . . . [Likewise, the trial court agreed with the State's argument regarding the efficacy of the Vineland test.] [The trial court found] inherent problems with the administration of the Vineland. Participants are asked to evaluate the petitioner as if he were a free and functioning member of this society and as if the petitioner were seventeen years old. With regard to the petitioner's mother, she herself is barely a functioning member of this society and has not seen her son on a consistent basis for almost fifteen years. She is likely very unfamiliar with many of the tasks listed in the Vineland. Additionally, once she and the petitioner came to the United States they were only living together for a short time; thus, she had very little opportunity to observe the petitioner in a "traditional" setting. Therefore, this court finds the Vineland conducted with the petitioner's mother should be given very little, if any, weight. The Vineland was also administered to a Vietnamese prison guard at the facility where the petitioner is being held. The court finds the efficacy of this test to be questionable as well. When the test was administered, the petitioner had been incarcerated for over ten years. Petitioner is incarcerated in a manner that severely restricts his activities and in a manner that provides a strictly controlled environment. . . . He is not required to cook for himself; he is told when and how much medicine to take; he is given medical treatment when needed, without request; he is provided facilities and opportunities for attending to his personal hygiene. All of these areas are covered by the Vineland, yet in this case, the petitioner has lived in an environment for over ten years where he does not have to do anything for himself. Moreover, the prison guard has never observed the petitioner in any other environment. Therefore, the court also finds little weight should be given to the Vineland administered to the prison guard.

The post-conviction court also considered the testimony and testing completed by both Dr. Grant and Dr. Auble. Even so, the court found that the Petitioner "fails to meet his burden under the second prong of the statute. While the court does find that there is overwhelming proof that the petitioner suffers from deficits in the area of communication, of the ten AAMR criteria, this is the only area in which the court finds there to be deficits." ". . .[W]ith regard to the remaining criteria, this court finds no deficits." Despite Dr. Auble's testimony that petitioner's frontal lobe functioning indicates deficits in the areas of self-direction and social interpersonal skills, this court does not find deficits in these areas. Dr. Auble testified that she found the petitioner was mentally rigid and unable to adapt to new situations or modify his behavior. However, the specific testing which was used by Dr. Auble to evaluate these areas again related to certain language skills such as petitioner's ability to figure out the meaning of new words. Thus, the results of these tests were likely skewed by the fact that petitioner has a limited grasp of the English language. The court stated the following:

The assertion that petitioner has deficits in the areas of self-direction and social skills is further contradicted by testimony at petitioner's trial. At the trial, petitioner's sponsor, Ms. Mitchell testified that petitioner cared for her while she was ill; cooked for her family and even cared for her children, including a child who suffers from cerebral palsy. . . . Testimony at trial also indicated that

petitioner was able to hold a job and was even promoted to a job with more responsibility. . . . Additionally, after the murders, petitioner fled the city and evaded arrest for six months; and testimony at trial indicated it was the petitioner who negotiated the sale for the stolen gold and split up the proceeds amongst his co-defendants. . . . Moreover, any mental rigidity or ability to adapt could just as likely be attributable to cognitive dysfunction associated with petitioner's schizophrenia or treatment he is receiving for that condition.

The trial court accredited little weight to Dr. Auble's finding that the Petitioner demonstrated deficits in the area of health and safety as this finding was based largely upon the Independent Living Scale. The court further found that, because the Petitioner had spent most of his life living either on the streets or in prison, the Petitioner had little opportunity to develop or refine the skills associated with this criteria. Finally, the trial court found no deficit in the area of functional academics. While the court acknowledged that the Petitioner had deficits in the area of reading proficiency and language skills, the court found that the deficits were more in the area of communication rather than functional academics. In this regard, the trial court noted that the Petitioner only attended school in the United States for one year and attended school in Vietnam sporadically for a period of only two years. The court further noted that the Petitioner's score on one test was not below average and that other testing revealed a pattern where the Petitioner's math scores were higher than his reading scores. The court stated that, while the test scores indicated "some academic deficit," the court was unable to conclude that the results indicated "an overall deficit in the area of functional academics." In summary, the court concluded, "[A]lthough this court finds petitioner has deficits in one of the criteria listed in the Manual of the American Association of Mental Retardation, 9th Edition, namely, communication, this is not enough to conclude petitioner has deficits in adaptive behavior. Petitioner must demonstrate deficits in at least two of the listed criteria; thus, petitioner has failed to demonstrate that he has deficits in adaptive behavior as required by [Tennessee Code Annotated section] 39-13-203(a)(2)."

Regarding the third prong, the post-conviction court found that the Petitioner "failed to demonstrate that any such [adaptive] deficits manifested during the developmental period as required by part (a)(3) of the statute." Both parties agreed that no test of intellectual functioning was administered to the Petitioner prior to his reaching the age of eighteen or prior to his incarceration. The court noted that the Petitioner was first tested ten years after his incarceration. With consideration that no testing was performed until a decade after his incarceration, the court determined that the Petitioner could not establish that he satisfied the final prong of the statutory criteria. In so finding, the court concluded that neither Dr. Auble nor Dr. Grant could offer any real proof to establish that the deficits occurred prior to age eighteen. The court further relied upon the testimony and social history prepared by Doan Dinh at the first post-conviction proceeding. The court was not convinced that certain factors present in the Petitioner's childhood were indicative that the Petitioner's deficits manifested during this time. In this respect, the court determined that the Petitioner's late development could have been the result of "neglect" rather than neurological deficit. Finally, the court observed that the Petitioner suffered

from paranoid schizophrenia. This diagnosis was made ten years earlier and at least one expert testified that over time this disease would erode brain functioning. Thus, the court concluded that it was also likely that any deficits in intellectual functioning occurred as a result of this disease. In reaching this conclusion, the court noted that the Petitioner "suffered from schizophrenia for nearly eight years prior to being diagnosed and treated.

The trial court noted that this prong, like the adaptive deficit prong, was subjective. The court stated that this prong could be established by school records, medical records, documented social history, and observations of evaluating experts. "In this case[,] there are no school records, no medical records, very little documented social history and the observations of the experts on this point are speculative at best." The trial court concluded that "in light of the proof presented, it is not possible to discern when the petitioner's deficits in intellectual functioning developed, this court finds petitioner has also failed to meet his burden with respect to the third prong of the statute."

**Summary of Applicable Law**

In 1990, Tennessee Code Annotated section 39-13-203 was enacted prohibiting the execution of mentally retarded individuals. See Howell v. State, 151 S.W.3d 450, 456 (Tenn. 2004). While our supreme court determined that this legislation was not to be applied retroactively, the high court did hold that the execution of mentally retarded persons violated constitutional prohibitions against cruel and unusual punishment. Id. (citing Van Tran, 66 S.W.3d 790, 798-799 (Tenn. 2001)); cf. Atkins v. Virginia, 536 U.S. 304, 321, 122 S. Ct. 2242 (2002) (execution of mentally retarded individuals violates the United States Constitution).

As the Petitioner was convicted prior to the enactment of the statute, our supreme court determined that a claim that he was mentally retarded should be brought under procedures for re-opening a petition for post-conviction relief. Van Tran, 66 S.W.3d at 811-812. Moreover, while section 39-13-203 did not apply retroactively to the Petitioner's case, the supreme court held that the proper criteria for evaluating his claim of mental retardation were those set forth within the statute. Van Tran, 66 S.W.3d at 812.

Section 39-13-203 provides the following definition of mental retardation:
(1)     Significantly sub-average general intellectual functioning as evidenced by a functional intelligence quotient (I.Q.) of seventy (70) or below;
(2)     Deficits in adaptive behavior; and
(3)     The mental retardation must have been manifested during the developmental period or by eighteen (18) years of age.
All three criteria must be satisfied before a finding of mental retardation may be made. Moreover, our supreme court noted that the demarcation of an I.Q. score of seventy (70) in the statute is a "bright-line cutoff" and must be met. Byron Black v. State, No. M2004-01345-CCA-R3-PD, 2005 WL 2662577, at *12 (citing Howell, 151 S.W.3d at 456, 458-59. "[T]he statute should not be interpreted to make allowance for any standard error of measurement or other

circumstances whereby a person with an I.Q. above seventy could be considered mentally retarded." Id. (quoting Howell, 151 S.W.3d at 456).

Later, in Howell, the supreme court established the standards to be applied by the post-conviction court, delineated the appropriate burdens of proof, and determined that a petitioner is not entitled to have a jury determine whether he is mentally retarded. Byron Black v. State, No. M2004-01345-CCA-R3-PD, 2005 WL 2662577, at *11 (Tenn. Crim. App., at Nashville, Oct. 19, 2005), perm. to appeal denied, (Tenn. Feb. 2006) (citing Howell, 151 S.W.3d at 457-58, 463-65). Our supreme court noted that, in a motion to reopen a post-conviction proceeding, defendants must present facts which "would establish by clear and convincing evidence" that they are entitled to relief. Howell, 151 S.W.3d at 460. (citing T.C.A. § 40-30-117(a)(4)). However, the court, utilizing principles of due process, lowered the standard to the lesser "colorable claim" standard when claims are raised under Van Tran and Atkins. Id. at 463. Should the defendant set forth a "colorable claim" of mental retardation in his motion, he is entitled to an evidentiary hearing. Id.

Next, the court addressed the level of proof required in proving the allegations raised in the motion. Our supreme court, acknowledging the disparity between the burden placed on defendants at trial (preponderance of the evidence) and those in the post-conviction stage (clear and convincing evidence), held that due process prohibited the application of the higher standard of proof at the post-conviction stage. Id. at 463-64. Accordingly, the court held that "at an evidentiary hearing, [a defendant] will have the opportunity to prove mental retardation by preponderance of the evidence." Id. at 465. In so holding, the court recognized that, although its "holding . . . is at odds with the standard set out in Tennessee Code Annotated section 40-30-117," "it would violate due process to execute a defendant who is more likely than not mentally retarded." Id. at 464-65. Finally, the Howell court considered whether a defendant is entitled to have a jury determine whether he is mentally retarded with consideration of the United States Supreme Court rulings in Apprendi v. New Jersey and Ring v. Arizona. Our supreme court rejected Petitioner Howell's argument that a "defendant's lack of mental retardation is the functional equivalent of an aggravating circumstance . . .[that] must be found by a jury." Howell, 151 S.W.3d at 465. In so doing, our supreme court acknowledged that the United States Supreme Court, in Atkins, had "pointedly expressed that mental retardation should be considered apart from mitigating factors." Howell, 151 S.W.3d at 466. Additionally, our legislature placed the prohibition on executing mentally retarded individuals in Tennessee Code Annotated section 39-13-203, rather than placing it among the mitigating factors listed in Tennessee Code Annotated section 39-13-204(j). Howell, 151 S.W.3d at 466. The court held that the issue of mental retardation is "not one of aggravating or enhancing factors, but of eligibility for the sentence imposed by a jury." Id. The court further held that "mental retardation works to reduce the maximum possible sentence, based upon the jury's verdict, from death to life imprisonment." Id. at 467. In this regard, "[mental retardation] is not an element of the offense and is not required to be proven by the State nor found by a jury." Id. Based upon these conclusions, our supreme court held that "the determination of mental retardation is more appropriately left to the trial court judge, as contemplated under Tennessee Code Annotated section 39-13-203(c) which states

'[t]he determination of whether the defendant was mentally retarded at the time of the offense of first-degree murder shall be made *by the court*.'" Id. (emphasis in original). The court also noted that "the burden of persuasion in this respect in upon the defendant rather than the State." Id. (citing T.C.A. 39-13-203(c).

## I.  Right to Jury Determination on Mental Retardation

The Petitioner contends that the United States Constitution guarantees the Petitioner the right to a jury determination wherein the State shall have the burden to disprove his mental retardation beyond a reasonable doubt.[1]  The State responds that this claim is waived as the issue was not raised in the initial motion to reopen and because no court has ever granted a motion to reopen on this specific issue.  Alternatively, the State asserts that this issue was rejected by our supreme court in Howell v. State.  Our supreme court rejected the argument made by the Petitioner in Howell v. State.  See supra.  Accordingly, the Petitioner is not entitled to relief on this issue.

## II.  Whether the Petitioner is Mentally Retarded Pursuant to T.C.A.  § 39-13-203

### A.  Standard of Review

The question of whether a defendant is mentally retarded and, thus, ineligible for the death penalty is a mixed question of law and fact.  Byron Black v. State, No. M2004-01345-CCA-R3-PD, 2005 WL 2662577, at *12.  Thus, this Court must review the post-conviction court's findings of fact de novo, with a presumption of correctness that is to be overcome only when the preponderance of the evidence is contrary to the court's findings.  Id. (citing Fields v. State, 40 S.W.3d 450, 456 (Tenn. 2001)).  In reviewing the application of the law to the facts, however, this Court conducts a purely de novo review.  Id.  (citing Fields, 40 S.W.3d at 457).  Thus, no presumption of correctness attaches to the post-conviction court's conclusions of law. Id.

### B.  Tennessee Code Annotated § 39-13-203

In determining whether the Petitioner is mentally retarded and, thus, ineligible for the death penalty, this Court is bound by our supreme court's decisions in Van Tran and Howell.  As such, the applicable criteria to be used by a court in making a determination of mental retardation are those set forth in Tennessee Code Annotated section 39-13-203.  As previously noted, Tennessee Code Annotated section 39-13-203 sets forth the criteria for making a determination of mental retardation as it impacts one's eligibility for the death penalty.  Section 39-13-203 provides, in part,

(a)    As used in this section, "mental retardation" means:

---

[1] The Petitioner acknowledges that this issue is raised to preserve review by the United States Supreme Court.  See  State v. Gomez, 163 S.W.3d 632 (Tenn. 2005) (defendant not precluded from raising claim simply because prior decision rejected same).

> (1)    Significant subaverage general intellectual functioning as evidence by a functional intelligence quotient (I.Q.) of seventy (70) or below;
>
> (2)    Deficits in adaptive behavior; and
>
> (3)    The mental retardation must have been manifested during the developmental period, or by eighteen (18) years of age.

T.C.A. § 39-13-203(a). All three prongs of this definition must be satisfied to establish mental retardation.

## C. Standard of Proof

In Howell v. State, our supreme court held that "at an evidentiary hearing, [a defendant] will have the opportunity to prove mental retardation by preponderance of the evidence." Howell, 151 S.W.3d at 465. A preponderance of the evidence means evidence which is of greater weight, or is more convincing, than that evidence offered in opposition. 32A C.J.S. Evidence 1312 (2005). "[T]he term does not mean preponderance in amount, but implies an overbalancing in weight, and that it means, in the last analysis, 'probability of the truth.'" Id. (internal footnote omitted). "Suspicions are insufficient to amount to proof by a preponderance of the evidence." Id.

The satisfaction of this "preponderance" standard requires the finder of fact to evaluate the evidence, determine what evidence is reliable, and determine what evidence is probative to demonstrate the truth of the asserted proposition with the requisite degree of certainty. Id. In other words, a preponderance is such proof as leads the trier of fact to find that it is more probable than not, or more likely than not, that a contested fact exists. Id. A preponderance is attained where the evidence in its quality of credibility destroys and overbalances the equilibrium. Id. Moreover, it is not required that the trier of fact must be "entirely" or "thoroughly" satisfied or convinced, or satisfied with "clearness and certainty," or that a fact in issue shall be proved to "full satisfaction" or to "the reasonable satisfaction" of the trier of fact. Id. The probabilities must be such that the conclusion is acceptable to the judgment of the court or jury applied to the evidence in the particular case; mere proof of possibility, or possibilities, or even a preponderance of possibilities or a majority of chances, or a choice of probabilities, or among different possibilities, never can suffice alone to establish a proposition of fact.

## D. Petitioner's Argument

The Petitioner makes numerous complaints regarding the trial court's findings of fact and conclusions of law. Additionally, the Petitioner properly points out that this Court's review involves an application of the law to the facts and is de novo. In this regard, the Petitioner asserts that: (1) the credibility of the witnesses was not an issue in these proceedings; (2) the trial court was not choosing between two permissible views of the evidence because the State failed to present any witnesses or evidence; and (3) the judge at the evidentiary hearing was not the judge who presided over the original trial or the original post-conviction proceeding and, in this regard,

was not in better position than this Court to review the transcripts of these prior proceedings. The Petitioner also asserts that the trial court improperly attempted to exercise "clinical judgment" in finding that the Petitioner did not have deficits in adaptive behavior and that his subaverage intellectual functioning did not manifest during his developmental period.

### E. Review

#### 1. Significantly Subaverage General Intellectual Functioning

The post-conviction court found that the Petitioner has subaverage general intellectual functioning as evidenced by a functional I.Q. of 70 or below. The court found that "the [P]etitioner has proven by a preponderance of the evidence that he has a functional intelligence quotient of seventy (70) or below. Although the court found that the 1996 test score of 72 did not satisfy the first criteria of the statute, the additional testing performed upon the Petitioner did indicate that the Petitioner's I.Q. was below 70. Specifically, the trial court found that "[a]ll three subsequent I.Q. tests scores [65, 70, and 68] meet the requirements of [Tennessee Code Annotated] section 39-13-203(a)(1)." The Petitioner does not contest the lower court's conclusion as the first prong of the statute. We agree with the post-conviction court that the proof presented by the Petitioner establishes that he currently has a functional intelligence quotient of seventy (70) or below.

#### 1. Deficits in Adaptive Behavior

The second prong of the statutory criteria for establishing mental retardation, "adaptive functioning" refers to how effectively individuals cope with common life demands and how well they meet the standards of personal independence expected of someone in their particular age group, socio-cultural background, and community setting." Van Tran, 66 S.W.2d at 795 (citing American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders, 40 (4th ed. 1994)). A mentally retarded individual will have significant limitations in at least two of the following basic skills: "communication, self-care, home living, social/interpersonal skills, use of community resources, self-direction, functional academic skills, work, leisure, health, and safety." Id. Influences on adaptive functioning may include the individual's "education, motivation, personality characteristics, social and vocational opportunities, and the mental disorders and general medical conditions that may coexist with Mental Retardation." Id. In 1994, our supreme court construed the term deficits in adaptive behavior in its ordinary sense as "the inability of an individual to behave so as to adapt to surrounding circumstances." State v. Smith, 893 S.W.2d 908, 918 (Tenn. 1994).

The trial court determined that the Petitioner "did not have deficits in adaptive behavior." The Petitioner contests this finding. Specifically, the Petitioner asserts on appeal that the proof established by a preponderance of the evidence that he exhibits deficits in adaptive behavior, including (1) deficits in communication, (2) deficits in functional academics, and (3) deficits in social skills and self-direction. Moreover, the Petitioner asserts that he has scored two standard

deviations below the mean on standardized tests of adaptive behavior indicating, under the AAMR 10th, that he has deficits in adaptive behavior. The Petitioner also asserts that it is contradictory for the trial court to find that the results of the I.Q. tests are valid, but that the results of tests measuring functional academics and neurological impairment should be disregarded because they were given in English without the aid of an interpreter.

At the evidentiary hearing, Dr. Auble, relying upon the AAMR, Tenth Edition, categorized adaptive deficits into three main areas: (1) Practical, which she explained as the ability to maintain yourself independently in terms of academics and work environment; (2) Social, which she stated involved gullibility, social understanding, the ability to avoid being a victim, taking responsibility, and home skills; and (3) Conceptual, which she defined as an area involving language, reading, writing, managing money, self-direction, and abilities.

## A. Deficits in Communication

Dr. Grant testified that the Petitioner had "deficits in adaptive behavior as defined by the American Association of Mental Retardation and the American Psychiatric Association." He administered various tests to evaluate the Petitioner's language and communication skills. After evaluating the Petitioner's performance on these tests, Dr. Grant described the Petitioner's language and communication skill deficits as "severe." He added that the Petitioner's score on an expressive vocabulary test were "the lowest score that the norms would go to. . ." and that the Petitioner's score on the oral written language skills test revealed a significant deficit. Although Dr. Grant conceded that the Petitioner's native language is Vietnamese and that the tests were administered in English, he surmised that this fact did not skew the results reached. Specifically, Dr. Grant noted that the Petitioner's comprehension in Vietnamese was poor and that the Petitioner's English proficiency exceeded his proficiency in Vietnamese. Dr. Grant concluded that the Petitioner's deficits in communication skills satisfied one of the two criteria needed by the classification system for retardation.

The trial court did conclude that "there is overwhelming proof that the petitioner suffers from deficits in the area of communication, of the ten AAMR criteria. . . ." The Petitioner does not contest this finding made by the trial court.

## B. Deficits in Functional Academics

Dr. Grant conducted an assessment of the Petitioner's academic skills. As a result of his evaluation, Dr. Grant concluded that the Petitioner had a reading comprehension score of 4.1 and had a reading grade level of 3.1. He added that the Petitioner's spelling was at a 4.1 grade level and that his math skills were at a 7.6 grade level. Dr. Grant concluded that the Petitioner's proof performance in spelling, reading, and reading comprehension were evidence of a significant deficit. He further commented that, although the Petitioner had been in a G.E.D. program classroom for eight to nine years, he is still scoring at a 4.1 grade level in reading. Based upon the Petitioner's scores, Dr. Grant stated that the Petitioner's "functional academic skills are

significantly impaired," thus satisfying another of the criteria needed by the classification system for retardation."

## C.  Deficits in Social Skills and Self-Direction

The Petitioner contends that the trial court's findings are incorrect.  First, he contends that that the trial court's finding that the results on the Halstead Reitan battery were skewed "by the fact that petitioner has a limited grasp of the English language" is without support in the record.  Next, he contends that the trial court attempted to exercise clinical judgment and raised the evidentiary bar by demanding of the petitioner a level of incapacity that is not required for a finding of adaptive deficits.  The Petitioner also finds fault with the trial court's statement that the Petitioner's mental rigidity or inability to adapt "could just as likely be attributable to cognitive dysfunction associated with petitioner's schizophrenia or treatment he is receiving for that condition" as being both speculative and based on a misreading of the record.  The Petitioner asserts that the cumulative effect of these errors compromises the trial court's analysis and findings.

## D.  Petitioner Scored Two Standard Deviations Below the Mean

The Petitioner asserts that the AAMR, Tenth Edition, provides that adaptive behavior can be assessed through the use of standardized instruments.  See  AAMR, 10TH Edition, p. 76 ("an overall score on a standardized measure of conceptual, social, and practical skills.).  He relies upon two different standardized tests of adaptive behavior to support his assertion that the fact that both of these test scores were two standards deviations below the mean are proof of adaptive deficits.  In this regard, he contends that the trial court's failure to accredit the results of these standardized tests was error.

Dr. Grant administered the Independent Living Scales test to the Petitioner. The Petitioner received a score of 69.  He related that this score fell two standard deviations below the mean, thus satisfying the criteria for having a significant deficit in adaptive behavior. Similarly, the Petitioner received scores of 58 and 65 on two successive administrations of the Vineland adaptive behavior scale.  Both of these measures satisfied the criteria for the American Association of Mental Retardation as two standard deviations below the mean for adaptive behavior.

Dr. Auble corroborated the testimony of Dr. Grant by stating that standardized tests were used to determine whether a person had adaptive deficits.  Dr. Auble testified that the Petitioner's scores on the Independent Living Scale and the two Vineland tests placed the Petitioner in the impaired range, that is two standard deviations below the mean.  She explained that, according to both the AAMR and the DSM-IV, these test scores were illustrative of adaptive deficits.

-24-

**E. Review of Trial Court's Findings Regarding Deficits in Adaptive Behavior**

Despite the testimony of the Petitioner's experts and the fact that the State presented no evidence, the trial court rejected the results of the standardized tests and the opinions of the Petitioner's experts. The Petitioner implies that this fact, alone, is error. While the State presented no new evidence at the evidentiary hearing on the motion to reopen, the trial court need not review the evidence presented at the motion to reopen in a vacuum. In other words, information regarding the Petitioner presented at prior proceedings is relevant in making a proper determination regarding mental retardation. See In re: Anderson Hawthorne, Jr., 105 P.3d 552, 559 (Cal. 2005); Morrison v. State, 583 S.E.2d 873, 876 (Ga. 2003). In this regard, we note that the trial court is neither bound by the opinion of expert witnesses nor by test results. In re: Anderson Hawthorne, Jr., 105 P.3d at 559. Rather, the court may weigh and consider all evidence bearing on the issue of retardation. Id. (citations omitted). Thus, the trial court properly considered evidence introduced at prior proceedings, including the penalty phase of the trial and the prior post-conviction proceeding.

In the present case, the trial court determined that the "unique circumstances of [the] petitioner's background," rendered questions posed on the Independent Living Scale "absurd." Similarly, the trial court rejected the results of the Vineland tests. The trial court observed that these tests required that two observers, the Petitioner's mother and a correctional officer, evaluate the Petitioner as if he were a free and functioning member of society. The trial court discredited these observations, noting that the Petitioner's mother had not seen him on a consistent basis for approximately fifteen years and the correctional officer had never observed the Petitioner in a non-institutionalized setting. The trial court further determined that the Petitioner was in a position unique to other individuals, and those circumstances impacted the efficacy of the testing and evaluation procedures. The trial court added that the circumstances of the offense contradicted the findings of the Petitioner's experts regarding deficits in adaptive behavior.

Adaptive behavior means the effectiveness or degree with which a person meets the standards of personal independence and social responsibility expected of the person's age and cultural group. See American Association on Mental Deficiency (AAMD), at 11. The adaptive behavior criteria are exceedingly subjective, and, undoubtedly, experts will be found to offer opinions on both sides of the issue in most cases. There are evidentiary factors, however, which factfinders in the criminal trial context may focus upon in weighing evidence as indicative of mental retardation or of a personality disorder, including:

1. Did those who knew the person best during the developmental stage think the person was mentally retarded at that time and, if so, act in accordance with that determination?
2. Does the person's conduct show leadership or does it show that he is led around by others?
3. Is his conduct in response to external stimuli rational and appropriate, regardless of whether it socially acceptable?

-25-

4. Does the person respond coherently, rationally, and on point to oral or written questions or do his responses wander from subject to subject?
5. Can the person hide facts or lie effectively in his own or others' interests?
6. Did the commission of the offense require forethought, planning and complex execution of purpose?

See Ex parte Jose Garcia Briseno, 135 S.W.3d 1 (Tex. Crim. App. 2004).

Although experts may offer insightful opinions on the question of whether a particular person satisfies the psychological diagnostic criteria for mental retardation, the ultimate issue of whether a person is, in fact, mentally retarded for purposes of the constitutional ban on excessive punishment is one for the finder of fact, based upon all of the evidence and determinations of credibility. Ex parte Jose Garcia Briseno, 135 S.W.3d at 1 (citing Kansas v. Crane, 534 U.S. 407, 413, 122 S. Ct. 867 (2002) (noting that "the science of psychiatry, which informs but does not control ultimate legal determinations, is an ever-advancing science, whose distinctions do not seek precisely to mirror those of the law"); State v. Williams, 831 So.2d 835, 859 (La. 2002) (in determining Atkins claim, "the trial court must not rely so extensively upon this expert testimony as to commit the ultimate decision of mental retardation to the experts.").

We agree with the trial court's assessment that the Petitioner is in a unique position. The Petitioner was born in Vietnam. There is no question that the Petitioner's childhood was atypical. His social history reveals abuse, neglect, and social ostracism. He essentially "lived on the streets" until age seventeen when he came to this country through the assistance of Catholic Charities. The Petitioner's formal schooling was limited to several years in Vietnam and about one year in this country. The Petitioner has spent the majority of his time in this country incarcerated. While the Petitioner's experts maintained that the Petitioner was more proficient in the English language than in Vietnamese, proof at the Petitioner's original post-conviction hearing indicated that the Petitioner had difficulty communicating with trial counsel until a Vietnamese interpreter was appointed. A social worker with Catholic Charities testified that the Petitioner spoke and understood the Vietnamese language. The Petitioner has a history of drug and alcohol use. The Petitioner has also been diagnosed with paranoid schizophrenia. The proof also corroborates the trial court's conclusion that the Petitioner was in a position unique to most American adults. Dr. Grant conceded that the Petitioner had probably never "filled out a check, or a money order." Moreover, there is no indication that the testing questions took into account the Petitioner's lifestyle in Vietnam or that he has spent the majority of his adult life incarcerated. Accordingly, we agree with the trial court's assessment that little weight should be given to the Petitioner's below average score on the Independent Living Scale.

As recognized by the United States Supreme Court, "[n]ot all people who claim to be mentally retarded will be so impaired as to fall within the range of mentally retarded offenders about whom there is a national consensus." Atkins, 536 U.S. at 317, 122 S. Ct. at 2242. The circumstances of the Petitioner's crime belie any assertion that the Petitioner suffered from any deficit in intellectual ability or adaptive skills. The Petitioner had previously been employed by the victims of his crime. He knew the layout of the restaurant and knew that jewelry was kept on

the premises. The Petitioner did the talking with one of the victims at the onset of the crime. The Petitioner was the person that went into the office to collect the jewelry. After the crime, the Petitioner escaped with two of his co-defendants to Houston, Texas, where it was the Petitioner who arranged to sell the jewelry to a Vietnamese man for $4,000. It was also the Petitioner who paid this man from the proceeds and divided the money with his two co-defendants. The Petitioner's active participation and planning in the offense is the "opposite end of the spectrum from [the] behavior of mentally retarded offenders." Atkins, 536 U.S. at 319-20, 122 S. Ct. at 2242.

This court defers to the trial court's findings of fact as they are supported by the record. The determination of what constitutes mental retardation in a particular case varies sharply depending upon who performs the analysis and the methodology used. Although the defense experts testified that the Petitioner demonstrated proficient deficits in adaptive behavior, the trial court found to the contrary. We agree. In the legal setting, the court must not become so entangled with the opinions of psychiatric experts that we lose sight of the nature of the criminal offense itself. We must also not turn a blind eye to the defendant's ability to use society to better his needs. There are mentally retarded persons who are criminals, but they tend to commit fairly primitive crimes, impulsive crimes, and sudden acts of violence. The more complex the crime, however, the less likely that the person is mentally retarded. Thus, the court cannot forget to examine the nature of the criminal conduct and the circumstances involved in that conduct when determining whether a person is mentally retarded. Because there is ample evidence in the record to support the trial court's factual determinations, we adopt its findings.

### 3. Manifestation During Developmental Period

Finally, the Petitioner contends that a preponderance of the proof established that mental retardation manifested during the developmental period. The Petitioner asserts that the trial court required proof greater than a preponderance of the evidence and that the trial court misread and misconstrued the record. The Petitioner cites to evidence in the record as establishing that it was "more likely than not" that the Petitioner's intellectual functioning was subaverage in the developmental period. Specifically,

1. The results of achievement tests administered when the Petitioner was 17 years of age are consistent with his current I.Q. Dr. Grant testified that there is a "very high, strong correlation between achievement and intelligence."
2. Dr. Grant testified to the fact that I.Q. is relatively stable over time. He also found it significant that despite 9 years of participation in G.E.D. classes at the prison, the Petitioner still reads at the same 4th-grade level that he read at when he was tested at age 17.
3. The Petitioner suffers from schizophrenia. Long-term studies have shown that children who develop schizophrenia in adulthood have low I.Q.'s in childhood: their low functioning exists prior to the onset of the disease.

4. As a child, the Petitioner exhibited significant impairments and delays in reaching developmental milestones, particularly the ability to use language. He has never acquired more than a child-like use of his native Vietnamese, which also indicated that his intellectual and adaptive impairments manifested in the developmental period.

5. Petitioner's early life was beset with numerous known risk factors which predisposed him to mental retardation, e.g.: maternal poverty, maternal malnutrition during pregnancy, lack of prenatal care, injuries during pregnancy, maternal smoking during pregnancy, low intelligence of the mother, lack of preparation for parenthood, lack of medical post-natal care, malnutrition, family poverty, lack of adequate stimulation, lack of schooling, inadequate safety measures, physical abuse, lack of intervention services, lack of special education services, and inadequate family support.

The Petitioner had not been administered any test of intellectual functioning prior to reaching the age of eighteen, and no testing was performed until ten years after his incarceration. The only proof establishing this third prong were reliance upon social factors present in the Petitioner's childhood, including extreme poverty and child abuse. In this regard, we cannot conclude that the trial court's conclusion that the Petitioner's late development could have been the result of "neglect" rather than neurological deficit was in error or contrary to the evidence. The evidence of poverty, child abuse, lack of education, family dysfunction and poor social conditions are not enough to demonstrate that any deficits manifested during the developmental period. The proof established that the Petitioner supported himself, took care of others, and was employed. The proof also established that the Petitioner, with the aid of an interpreter, was able to assist and communicate with his trial attorneys. The occurrences of these abilities all occurred after the age of eighteen. Moreover, we conclude that the fact that the Petitioner admits to alcohol and drug abuse and the fact that he has been diagnosed with schizophrenia may have impaired his brain functioning. Finally, Dr. Auble's litany of potential "risk factors" fail to provide sufficient facts to support the conclusion that any impairments were revealed during the developmental period. Accordingly, Petitioner cannot satisfy the third prong of the test for mental retardation.

**Conclusion**

While there is expert opinion in this record that would support a finding that the Petitioner is mentally retarded pursuant to Tennessee Code Annotated section 39-13-203, there is also ample evidence to support the trial court's finding that the Petitioner failed to prove that he is mentally retarded by a preponderance of the evidence. The circumstances of every case are unique as are the circumstances of every defendant. Circumstances exist in this case which cloud the picture, particularly the contradictory proof regarding the Petitioner's Vietnamese background, i.e., whether Vietnamese or English is the Petitioner's proficient language. See Jose Alfredo Rivera v. Doug Dretke, No. Civ. B-03-139, 2006 WL 870927, *15 (S.D. Tex. Mar. 31, 2006). Additionally, extraneous factors, i.e., drug use and mental illness, further skew the

determination of mental retardation. These factors, in connection with the requirement that experts must speculate retrospectively as to what conditions existed prior to the age of eighteen and the obvious motivation in making such claim, further complicate this court's duty on appeal. We defer to the trial court's determinations of credibility and adopt the trial court's ultimate findings of fact. Based on those findings and this court's independent review, we conclude that the trial court's determination that the Petitioner is not mentally retarded pursuant to Tennessee Code Annotated section 39-13-203, should be affirmed. Finding no other error in the record, the trial court's denial of relief is affirmed.

_____
JOHN EVERETT WILLIAMS, JUDGE